[Nos. 35469-1-II; 35561-2-II; Division Two. July 29, 2010.] 36933-8-II.

T. DeLong et al., *Respondents*, v. Allan W. Parmelee, *Appellant*, Karen Brunson et al., *Respondents*.

T. DeLong et al., *Respondents*, v. The Department of Corrections, *Respondent*, Allan W. Parmelee, *Appellant*.

The Department of Corrections, *Respondent*, v. Allan W. Parmelee, *Appellant*.

124

*Gerald Banner*, pro se.

*Hank L. Balson* (of *Public Interest Law Group PLLC*) and *Michael C. Kahrs* (of *Kahrs Law Firm PS*), for appellant.

*Robert M. McKenna, Attorney General, Daniel J. Judge, Senior Counsel,* and *Sara J. Di Vittorio, Assistant,* for respondents.

*Robert M. McKenna, Attorney General,* and *Maureen A. Hart, Solicitor General,* on behalf of the Attorney General of the State of Washington, amicus curiae.

*William J. Crittenden* and *Patrick D. Brown* on behalf of Washington Coalition for Open Government, amicus curiae.

*Peter A. Danelo, Joshua B. Selig, Nancy L. Talner,* and *Melissa R. Lee* on behalf of American Civil Liberties Union of Washington/Columbia Legal Services, amicus curiae.

¶1 QUINN-BRINTNALL, J. — This appeal concerns three separate decisions of the Clallam and Thurston County

Superior Courts[1] regarding public disclosure requests that Allan Parmelee made under the Public Records Act (PRA), ch. 42.56 RCW. In all three cases, Parmelee argues that the superior courts erred when they found that Department of Corrections (DOC) employee photographs are excluded from the PRA under the privacy exemption.

¶2 In *Mathieu v. Parmelee*,[2] Parmelee also argues that the superior court (1) violated his right to due process when it found that the photographs were excludable without first affording him a meaningful opportunity to participate in the proceedings and (2) erred when it found that Sergeant Laura Mathieu's personnel records, "critical" employment records, intelligence and investigation reports, and portions of her compensation records and training records were not subject to disclosure under the PRA.

¶3 In *DeLong v. Department of Corrections*,[3] Parmelee further argues that (1) the petitioners' action should be dismissed because they failed to join him as a necessary party under CR 19(a), (2) the superior court erred when it refused Parmelee's request to intervene under CR 24, and (3) the superior court erred when it took judicial notice of the facts from *Mathieu v. Parmelee* in the *DeLong v. DOC* proceedings.

¶4 In *Department of Corrections v. Parmelee*,[4] Parmelee contends that (1) the superior court improperly considered his proposed use of employee photographs when determining whether the documents were subject to disclosure under the PRA; (2) his intended use of the photographs cannot create a privacy right in the named DOC employees; and (3) the PRA's injunction statute, RCW 42.56.540, permits the

---

[1] *DeLong v. Parmelee*, No. 06-2-00637-5 (Clallam County Super. Ct., Wash. Sept. 19, 2006) (when referring to this case on appeal, we will call it *Mathieu v. Parmelee* to avoid confusion with cause no. 06-2-00878-5); *DeLong v. Dep't of Corr.*, No. 06-2-00878-5 (Clallam County Super. Ct., Wash. Nov. 2, 2006); *Dep't of Corr. v. Parmelee*, No. 06-2-01406-2 (Thurston County Super. Ct., Wash. Jan. 29, 2007).

[2] *Mathieu v. Parmelee* (cause no. 35469-1-II).

[3] *DeLong v. Dep't of Corr.* (cause no. 35561-2-II) (*DeLong v. DOC*).

[4] *Dep't of Corr. v. Parmelee* (cause no. 36933-8-II) (*DOC v. Parmelee*).

examination of a specific public record only if that public record is not otherwise exempt.

¶5 The PRA mandates that public records "shall" be available for public inspection and copying unless the record is specifically exempt from disclosure. RCW 42-.56.070(1). The PRA statute does exempt from disclosure documents that, if released, would constitute an unreasonable invasion of privacy, RCW 42.56.050, and specific intelligence information compiled by law investigative, law enforcement, and penal agencies that is essential to effective law enforcement or for the protection of any person's right to privacy. Former RCW 42.56.240 (2005). In addition, the PRA provides that a trial court may enjoin the examination of a specific public record if the examination would (1) clearly not be in the public interest, (2) substantially and irreparably damage any person, or (3) substantially and irreparably damage vital government functions. RCW 42.56.540.

¶6 As an initial matter, in light of the plain language of the PRA, our Supreme Court's analysis in *Livingston v. Cedeno*, 164 Wn.2d 46, 186 P.3d 1055 (2008), and the fact that the legislature has declined to narrow the definition of those who may access public records under the PRA, we are constrained to hold that prison inmates, including those blatantly abusing the PRA, have standing to request records under the PRA.[5] Because the appellate record here is insufficient for us to do otherwise, we presume for purposes of this appeal only that the photographs DOC prepared to give Parmelee in response to his PRA request are public records relating to the conduct of government or proprietary function. And, despite DOC's argument to the contrary, we hold that in this case an individual's identification badge photograph is not exempt from disclosure under the privacy exemption because it is not the type of

[5] We note that on March 20, 2009, our legislature passed Substitute S.B. 5130, 61st Leg., Reg. Sess. (Wash. 2009), codified at RCW 42.56.565, effective March 20, 2009, which specifically addresses access to nonexempt public records by prison inmates. LAWS OF 2009, ch. 10, § 1.

intimate, personal information the PRA intended to protect. But while Parmelee is correct that the PRA prohibits DOC from considering an individual's status as an inmate when determining if information is subject to disclosure under the PRA, we hold that a trial court may consider a PRA requestor's explicit and volunteered threat when deciding whether to grant a government employee's personal request for an injunction.

¶7 In *Mathieu v. Parmelee*, although the trial court did not violate Parmelee's right to due process, it erred when it found that Mathieu's personnel records, intelligence and investigation reports, and portions of her compensation records and training records were not subject to disclosure under the PRA. Mathieu's personnel records and her intelligence and investigation reports are subject to disclosure if they contain specific instances of misconduct. Mathieu's training records are also subject to disclosure unless they fall under a specific exemption. And information about a public employee's compensation, including vacation and sick leave pay, is subject to disclosure. Because our record does not contain the documents DOC compiled for Parmelee regarding Mathieu, remand is necessary to allow the trial court to review in camera the documents regarding Mathieu's personnel records, intelligence and investigation reports, and training records and determine whether Parmelee is entitled to these records.

¶8 In *DeLong v. DOC*, while Parmelee's request to intervene was properly denied as untimely, the trial court erred when it refused to join Parmelee as a necessary party because his participation was necessary to protect his interests under the PRA. And because the issues in *Mathieu v. Parmelee* and *DeLong v. DOC*, as well as the evidence on which the petitioners relied, were identical, the trial court did not err when it took judicial notice in *DeLong v. DOC* of the documentary evidence in *Mathieu v. Parmelee*.

¶9 Accordingly, as to *Mathieu v. Parmelee*, we are constrained to reverse the injunction against Parmelee because Mathieu was not named in his counterfeit sexual predator

flyer and is unable to demonstrate that she was the victim of this explicit and volunteered threat. As to *DeLong v. DOC*, we must vacate for want of jurisdiction for failure to join Parmelee as a necessary party and remand to the trial court. Like *Mathieu v. Parmelee*, those DOC employees not named in Parmelee's counterfeit sexual predator flyer are not entitled to an injunction, but those DOC employees who were subject to this threat are entitled to injunctive relief. Thus, we remand all three cases to the trial court for further proceedings consistent with this opinion.

## FACTS

Parmelee's Background

¶10 Parmelee is a Washington State prison inmate currently in the custody of DOC. Parmelee has written several books, including *How to Win Prison Disciplinary Hearings*, as well as numerous articles for national publications such as *Prison Legal News* and *Prison Living*. Parmelee frequently requests public records, ostensibly pertaining to his writing projects and activist work.

¶11 In 2004, a jury found Parmelee guilty of two counts of first degree arson for the fire-bombing of two automobiles belonging to attorneys opposing him in two separate civil legal actions. Parmelee fire-bombed the automobiles at the attorneys' respective residences. Prior to the first attack, Parmelee posted the attorneys' home addresses on a web site he created to complain about court rulings in his custody and dissolution dispute with the victims' client, Parmelee's former wife. On that web site, Parmelee "invited" other disgruntled fathers to pay the attorney victim "a visit." Clerk's Papers (CP) (Mathieu) at 324.

¶12 In addition, Parmelee's first criminal trial on the arson charges resulted in a mistrial because the superior court discovered that Parmelee possessed materials with discrete personal information about the jurors who had been impaneled. The trial court found that Parmelee had secreted this information in direct violation of a superior

court order that he not retain any information on jurors. After the jury found him guilty, Parmelee expressed extreme hostility toward the judge and subsequently sought the judge's photograph from the Washington State Bar Association.

¶13 Parmelee has written several letters to DOC staff stating that he intends to misuse information that he receives about DOC staff. He has also made comments that DOC staff have interpreted as thinly veiled threats against them and their families.

¶14 On July 20, 2005, Parmelee wrote a letter to DOC Secretary Harold Clarke in which he referred to former Clallam Bay Correctional Center (CBCC) Superintendent Sandra Carter as an "anti-male . . . lesbian," and Associate Superintendent John Aldana as an "antagonist." CP (Mathieu) at 327. Parmelee went on to state that "[h]aving a man-hater lesbian as a superintendent is like throwing gas on already smouldering [sic] fire." CP (Mathieu) at 327 (alteration in original). Parmelee asked Clarke for his "thoughts on this so [Parmelee could] conclude a series of media releases [he had] planned about CBCC." CP (Mathieu) at 327.

¶15 On October 8, 2005, Parmelee wrote a letter to Carter, which stated,

> I have initiated investigators to possibly interview your neighbors, photograph your home and conduct a detailed due diligence into any actual or potential parties or witnesses to lawsuits. Some of the information will be interpreted and posted on the internet to make it easier for others to sue you people also, and to let the public know what type of people their taxes pay.
>
> . . . .
>
> . . . I already have some of your home addresses (for a dollar each) and now await the video and photographs. You want to conduct yourselves like official crooks, [sic] you deserve the publicity that comes with it.
>
> . . . .

This letter is not intended to threaten, intimidate or coerce anyone. It is intended to simply put you on notice so you won't jump to the wrong conclusion when you see a photographer or video camera operator around yours [sic] or your staff's homes.

CP (Mathieu) at 81-82.

¶16 On March 19, 2006, CBCC staff confiscated a letter from Parmelee's cell addressed to Maxwell Tomlinson of Max Investigations. In that letter, Parmelee referred to past and future plans to send people on his behalf to CBCC staff members' homes or to follow them, indicating, "I'll have to call through another as we've done before. As usual bill me through the usual source, up to $2,000.00 per lot that I will pre-approve." CP (Mathieu) at 328. Parmelee went on to state that "[s]everal prison staff are defendants in lawsuits and I want them followed and photographed, and all the public records you can find, including SS's, DC's, and vehicle licenses, codes and pictures of them, their homes, and vehicles." CP (Mathieu) at 328. Parmelee identified 20 DOC employees he wanted Tomlinson to follow. He then went on to state,

I also propose that when we get ready to move forward, that your material not only be posted on the internet for other prisoners to access, but to hire some legal talent to enforce security and to prevent these inbred bullies from causing too much more trouble. Be careful, as we're dealing with people whose thought processes are defective and base. You may need a few bullies of your own. CR-4 service will be required.

CP (Mathieu) at 328.

¶17 On July 9, 2006, Parmelee wrote another letter to Carter informing her that he had hired picketers to picket the homes of DOC employees. He stated that he had hired individuals for

$2,000.00 per weekend to picket peacefully [outside] some DOC staff's residences and hand out information brochures about DOC employees to the neighbors. . . . These pickets are planned for Olympia DOC people whom [sic] may be in the dark about what's going on here and how bad things really are. They are

also planned to occur at your CBCC staff's residences, which one(s) and when will not be revealed until a day or so in advance to the media.

CP (Mathieu) at 328-29.

¶18 On July 11, 2006, Parmelee received a serious infraction at CBCC when he handed a DOC employee a mock-up of a flyer containing the names of several DOC staff members. Parmelee told the employee, "These are the flyers that I am having printed and passed out tomorrow and if you don't stay out of it your dead bitch will be on one of them." CP (Mathieu) at 329.

¶19 The flyer Parmelee gave the correctional officer is entitled "SEXUAL PREDITORS [sic] IN YOUR NEIGHBORHOOD" and lists the names of six DOC employees.[6] CP (Mathieu) at 91. Above each DOC employee's name is a rough outline of a picture of that individual with "insert actual photos here as designated" written across one of the sketches. CP (Mathieu) at 91. The flyer states in relevant part,

These sexual preditors [sic] . . . work at the Clallam Bay prison where homosexual assaults are encouraged against prisoners by Sandra Carter, the gay feminist superintendent. Protect Your Families and Children. Demand The [DOC] Fire These People Now Before You Become Their Next Victim.

CP (Mathieu) at 348.

¶20 From July 2004 to August 2006, Parmelee submitted 95 public disclosure requests to DOC. In total, DOC claims that Parmelee has submitted over 400 public records requests to DOC.

A. *MATHIEU V. PARMELEE*

1. PARMELEE'S PUBLIC DISCLOSURE REQUEST

¶21 On March 16, 2006, Parmelee submitted a public disclosure request to DOC. Parmelee requested a number of

---

[6] The employees named in the flyer are Robert O'Neel, Carrol Riddle, Nathan Cornish, Jerry McHaffie, Michael Christensen, and Carter.

documents regarding Mathieu, including her (1) photograph, (2) performance reviews for the previous five years, (3) compensation records, (4) "critical" employment records for the previous seven years, (5) administrative grievances and internal investigation records for the past five years, and (6) DOC-sponsored training programs. Parmelee requested identical information regarding nine other DOC employees. Parmelee mailed the request to Denise Larson, a CBCC employee. She received the letter on March 17, 2006.

¶22 On March 22, 2006, within five days of receiving Parmelee's request, Larson responded as required by former RCW 42.56.520 (1995). Larson informed Parmelee that it would take approximately 21 business days to gather the documents he requested and that she would contact him if DOC needed more time to complete the request.

¶23 On April 19, 2006, Parmelee submitted a supplemental request to his March 16, 2006 public disclosure request for information regarding three additional DOC employees. Parmelee mailed this request to Larson as well, and she received it on April 28, 2006.

¶24 On May 1, 2006, Larson responded to Parmelee's second request, again in compliance with former RCW 42.56.520. In her response, Larson informed Parmelee that she would add his second request to his March 16, 2006 request, per his instruction. Larson also indicated that it would take approximately 21 additional business days to gather the new documents requested.

¶25 On May 24, 2006, CBCC employee Pamela Riddle notified Parmelee in writing that she would respond to his March 16, 2006 public disclosure request within 14 business days after May 31, 2006.

¶26 On June 21, 2006, Denise Vaughan, a public disclosure specialist employed by DOC, notified Parmelee that DOC had gathered the documents responsive to his March

16, 2006 public disclosure request.[7] Vaughan also informed Parmelee that the DOC employees affected by his request were being notified that DOC was disclosing these documents to Parmelee. Lastly, Vaughan notified Parmelee that because she was notifying the affected DOC employees, she would contact him again within 30 business days, August 3, 2006.

### 2. MATHIEU'S PETITION FOR INJUNCTIVE RELIEF

¶27 On July 19, 2006, Mathieu[8] filed a petition and motion for injunctive relief. On the same day, the superior court entered a temporary restraining order, preventing DOC from disclosing the records Parmelee had requested. In response, on August 18, 2006, Parmelee filed a "Third Party Verified Complaint for Public Disclosure Act Violations," in which he named CBCC Superintendent Karen Brunson and Clarke as defendants. CP (Mathieu) at 356. Parmelee sought an order compelling DOC to disclose his requested records and asked for penalties and fees under RCW 42.56.550.[9]

¶28 After July 19, 2006, Vaughan repeatedly notified Parmelee per the time frames in her letters that she could not release the documents responsive to the March 16, 2006 request because of the entry and subsequent extensions of the July 19, 2006 temporary restraining order.

¶29 On August 22, 2006, DOC submitted an answer to Parmelee's third party complaint, stating that it had acted in good faith in response to his public disclosure requests

---

[7] The record does not include a copy of the packet DOC prepared for Parmelee in response to his PRA request, nor were the documents reviewed by the superior court.

[8] Although the petition also named the 12 other DOC employees as parties to the action, only Mathieu signed the petition and, thus, she is the only petitioner on appeal. Several of the remaining employees later became some of the petitioners in the *DeLong v. DOC* matter.

[9] Under RCW 42.56.550(4), "Any person who prevails against an agency in any action in the courts seeking the right to inspect or copy any public record . . . shall be awarded all costs, including reasonable attorney fees, incurred in connection with such legal action."

and asked that the superior court dismiss his complaint. DOC also submitted a brief in support of Mathieu's petition, arguing that the superior court could grant Mathieu injunctive relief in light of Parmelee's history of harassing behavior, regardless of the applicability of any exemptions under the PRA.

¶30 On September 27, 2006, Vaughan notified Parmelee that copies of documents responsive to the March 16, 2006 public disclosure request were available.

¶31 On October 23, 2006, DOC moved for summary judgment and dismissal of Parmelee's third party complaint, arguing that DOC had not violated the PRA because it had gathered the requested documents but then could not deliver the documents to Parmelee because of the superior court's temporary restraining order.

¶32 On October 24, 2006, the superior court entered a permanent injunction enjoining the DOC from releasing documents relating to Mathieu, except for her training records for 24 months prior to Parmelee's request, and records regarding her pay grade and pay scale. The superior court reasoned that a permanent injunction was appropriate because disclosure would violate Mathieu's right to privacy under RCW 42.56.050, which exempts disclosure when it would be (1) highly offensive to a reasonable person and (2) not in the public interest.[10] Specifically, the superior court found that "[t]he privacy exemption . . . would preclude a requirement to provide photos of individual staff members [because e]mployment as a corrections officer does not require[,] nor does the public need to note[,] specific facial characteristics of DOC employees." CP (Mathieu) at 104.

¶33 The superior court went on to find that Mathieu's performance records were exempt under prior case law but that her "[c]ompensation records [were] discloseable if they relate to pay grade and information in general related to

---

[10] It did not analyze privacy rights Mathieu may have under Wash. Const. art. I § 7.

compensation under a particular pay grade," but that "[s]pecific deductions, itemizations and the like . . . are not required to be disclosed." CP (Mathieu) at 104. The superior court found that Parmelee's request for "critical" employment records was overly vague. The superior court also found that Parmelee's request for Mathieu's training records was somewhat vague but that a list of Mathieu's specialized training was discloseable for a period of 24 months prior to Parmelee's request. Moreover, the superior court found that Parmelee's request for administrative grievances as well as intelligence and investigation records violated the law enforcement exemption because they are investigations into the conduct of specific prison staff in the performance of their law enforcement duties which would unnecessarily impact the functioning of a law enforcement agency/penal agency in the performance of its legal functions.

¶34 Furthermore, the superior court found that Parmelee submitted the requests to "gather information to harass, slander, and endanger [Mathieu] and her family." CP (Mathieu) at 23. The superior court also found that the requests were "not being made to gather information about governmental functions in accordance with the purpose of the PRA." CP (Mathieu) at 23. In addition to finding that producing the documents requested was not in the public interest, the superior court also found that "[p]roducing the documents requested by Respondent Allan Parmelee will substantially and irreparably damage [Mathieu]; and . . . substantially and irreparably interfere with the vital governmental functions furthered by the [DOC]." CP (Mathieu) at 23.

¶35 Parmelee timely appealed the superior court's permanent injunction in *Mathieu v. Parmelee*.

### B. *DELONG v. DOC*

¶36 After the superior court dismissed all CBCC personnel except Mathieu in the above action, several of the dismissed petitioners, along with numerous other CBCC

personnel, filed a renewed petition seeking an injunction against DOC that would prevent it from releasing any public records to Parmelee that pertained to them.

¶37 On October 10, 2006, Parmelee filed a notice of appearance and sought to intervene in the action "On Behalf Of His Unprotected Interests And [To] Replace The DOC As Defendant" CP (DeLong) at 119. Parmelee also sought in camera review of the records that DOC had compiled in response to his public disclosure request. Parmelee did not serve this pleading on the DOC and it is unclear whether he served the motion on any of the petitioners. Furthermore, the record does not reveal whether the motions were properly noted or confirmed according to local rules[11] and it does not appear from the record before us that the superior court ever ruled on the motions.

¶38 As in the *Mathieu v. Parmelee* case, DOC did not oppose the petitioners' motion; instead, it filed a brief in favor of the injunction and against Parmelee's attempts to intervene or join in the action. On October 12, 2006, DOC submitted the same declarations it had submitted in the *Mathieu v. Parmelee* case and asked the superior court to take judicial notice of those documents, which it did.[12]

¶39 On October 13, 2006, the superior court held a show cause hearing on the petitioners' motion. DOC's counsel informed the superior court that Parmelee had requested to appear at the hearing and stated that she objected because he was not a party to the action. The superior court declined to contact Parmelee because it did not believe that he was "necessary as a party to this action in its present configuration." Report of Proceedings (DeLong) (Oct. 13, 2006) at 6. The superior court then heard extensive argument from two of the petitioners detailing Parmelee's harassment of DOC personnel.

---

[11] Clallam County Superior Court Local Administrative Rule 77(k)(5).

[12] These documents were filed via facsimile and the duplicates were mistakenly filed in the *Mathieu v. Parmelee* file.

¶40 On October 23 and 24, 2006, the superior court entered two virtually identical written orders granting petitioners' motion for a permanent injunction, using reasoning identical to that in the *Mathieu v. Parmelee* case: the order only allowed DOC to release public records related to the petitioners' pay grade and pay scale, as well as training records for the 24 months immediately preceding Parmelee's request.

¶41 On November 6, 2006,[13] Parmelee renewed his motion to intervene and for in camera review of the records. The superior court denied the motion as untimely because it believed that Parmelee had a fair and full opportunity to litigate the issues in the *Mathieu v. Parmelee* matter.

¶42 On November 3, 2006, the superior court held another hearing to add the names of 55 additional DOC employees to the permanent injunction.

¶43 On December 15, 2006, the superior court entered an order in response to a motion for clarification from the parties in which it defined "personal information" as "information pertaining to a staff person's home, property, livelihood, physical body, character and/or family." CP (DeLong) at 15. Parmelee timely appealed the permanent injunction entered in *DeLong v. DOC*.

## C. *DOC v. Parmelee*

¶44 From February 2005 to July 2006, Parmelee requested electronic photographic images of over 2,525 DOC employees. Some of the 13 separate requests were for photographic images of specific employees and some were for groups, such as "all staff" at a particular correctional facility.[14] CP (DOC) at 29.

¶45 DOC did not ask Parmelee why he requested the photographs. But on July 11, 2006, Parmelee had a conver-

---

[13] Although the signature block on Parmelee's motion to intervene is dated October 25, 2006, it was not filed until November 6, 2006.

[14] In these requests, Parmelee also asked for documents containing other specific information regarding DOC staff members, but those requests are not related to this particular litigation.

sation with a staff member at CBCC in which he explained that he intended to use the photographs on flyers labeling the employees as "sexual preditors [sic]" that he had prepared and planned to disseminate.[15] CP (DOC) at 63.

¶46 On August 1, 2006, DOC filed a petition in Thurston County Superior Court in which it requested that the court enjoin the disclosure of the photographic images of DOC staff that Parmelee had requested.

¶47 On November 28, 2006, while the case was pending, Parmelee sent a letter to Mark Kuzca, Associate Superintendent of the Washington State Penitentiary. In the letter, Parmelee stated that he would be producing flyers labeling DOC employees as "homosexual predators" and included a sample flyer. CP (DOC) at 193.

¶48 On December 1, 2006, the superior court heard the DOC's motion for a permanent injunction and issued an order granting that injunction on January 19, 2007. The superior court found that the photographic images Parmelee sought were exempt because disclosure would violate the employees' right to privacy under RCW 42.56.050 based on Parmelee's intended use and, as a result, enjoined disclosure of the 2,525 photographs under RCW 42.56.540.

¶49 Parmelee timely appealed the superior court's permanent injunction in *DOC v. Parmelee*.

## ANALYSIS

¶50 We requested that the Washington State attorney general submit supplemental briefing addressing (1) whether an individual who has forfeited his right to vote by having been convicted of a felony has standing to request documents under the PRA; (2) whether government employees' badge identification photographs are public records, subject to disclosure under the PRA; and (3) to what extent government employees' performance reviews,

---

[15] These are the same flyers discussed in greater detail above.

training records, compensation records, administrative grievances, internal investigation records, and records defined by the requestor here as "critical employment records" are subject to disclosure under the PRA.

STANDARD OF REVIEW

¶51 We review injunctions issued under the PRA de novo. *Dragonslayer, Inc. v. Wash. State Gambling Comm'n*, 139 Wn. App. 433, 441, 161 P.3d 428 (2007) (citing *Spokane Police Guild v. Liquor Control Bd.*, 112 Wn.2d 30, 35, 769 P.2d 283 (1989)). Where the record consists only of affidavits, memoranda of law, and other documentary evidence, we stand in the same position as the superior court and are not bound by the superior court's factual findings on disputed facts. *Progressive Animal Welfare Soc'y v. Univ. of Wash.*, 125 Wn.2d 243, 252-53, 884 P.2d 592 (1994) (*PAWS*).

¶52 The PRA mandates that public records "shall" be available for public inspection and copying unless the record is specifically exempt from disclosure. RCW 42.56.070(1). The PRA is a " 'strongly worded mandate for broad disclosure of public records' " and should be "liberally construed to promote full access to public records, and its exemptions are to be narrowly construed." *Amren v. City of Kalama*, 131 Wn.2d 25, 31, 929 P.2d 389 (1997) (quoting *PAWS*, 125 Wn.2d at 251).

STANDING

¶53 In its amicus brief,[16] the attorney general argues that incarcerated felons possess diminished legal rights that are inconsistent with the right to request records under the PRA. Specifically, the attorney general argues that the PRA does not extend to incarcerated felons because "[u]nder the common law and article VI, section 3 of the Washington [State] Constitution, incarcerated felons lose

---

[16] We also granted the Washington Coalition for Open Government's and the American Civil Liberties Union of Washington/Columbia Legal Services' requests to file amicus briefs in response to that submitted by the attorney general.

their civil rights, and may neither vote nor hold public office," and "are subject to the comprehensive control of the Secretary of the Department of Corrections." Br. of Amicus Curiae Attorney General at 1-2. For these reasons, and because the purpose of the PRA is to protect the interests of the sovereign people of Washington in maintaining control over their government, the Attorney General argues inmates fall outside of the scope of the PRA. However sensible the stated policy, the plain language of the PRA does not permit such a ruling.

¶54 Although inmates have successfully brought suits under the PRA, Washington courts have not addressed whether inmates actually have standing to request documents under the PRA in light of their limited rights following incarceration. *See Burt v. Dep't of Corr.*, 168 Wn.2d 828, 231 P.3d 191 (2010); *Livingston v. Cedeno*, 164 Wn.2d 46, 50, 186 P.3d 1055 (2008); *Sappenfield v. Dep't of Corr.*, 127 Wn. App. 83, 110 P.3d 808 (2005), *review denied*, 156 Wn.2d 1013 (2006).

¶55 While inmates retain due process rights and the right to access the courts,[17] inmates do not retain all of the other rights a free citizen would have, such as the right to vote, freedom of association, or freedom of speech. *In re Pers. Restraint of Addleman*, 139 Wn.2d 751, 754, 991 P.2d 1123 (2000) (inmates retain their right to access the courts); *In re Pers. Restraint of Matteson*, 142 Wn.2d 298, 309-10, 12 P.3d 585 (2000) (inmates retain their right to due process); *Madison v. State*, 161 Wn.2d 85, 110, 163 P.3d 757 (2007) (Washington disenfranchisement of convicted felons is constitutional); *State v. Warren*, 134 Wn. App. 44, 71, 138 P.3d 1081 (2006) (inmates' freedom of association may be restricted to the extent reasonably necessary to accomplish

---

[17] But even this right is limited. *See Lewis v. Casey*, 518 U.S. 343, 355, 116 S. Ct. 2174, 135 L. Ed. 2d 606 (1996) (concluding an inmate's ability to access the courts "does not guarantee inmates the wherewithal to transform themselves into litigating engines capable of filing everything from shareholder derivative actions to slip-and-fall claims"). An inmate's right of meaningful access to the courts may be limited by the court if he abuses that right. *Cello-Whitney v. Hoover*, 769 F. Supp. 1155 (W.D. Wash. 1991); *see also In re Hartford Textile Corp.*, 681 F.2d 895 (2d Cir. 1982) (injunction issued against continuance of frivolous and vexatious litigation affirmed), *cert. denied*, 459 U.S. 1206 (1983).

the essential needs of the State and public order), *aff'd*, 165 Wn.2d 17, 195 P.3d 940 (2008), *cert. denied*, 129 S. Ct. 2007 (2009); *Jones v. N.C. Prisoners' Labor Union, Inc.*, 433 U.S. 119, 129, 97 S. Ct. 2532, 53 L. Ed. 2d 629 (1977) (inmates retain those First Amendment rights that are consistent with his status as a prisoner or with the legitimate penological objectives of the corrections system). Inmates' rights and privileges are subject to limitation because institutional goals and policies take precedence over their individual interests. *State v. Rainford*, 86 Wn. App. 431, 436, 936 P.2d 1210 (citing *State v. Hartzog*, 96 Wn.2d 383, 391, 635 P.2d 694 (1981)), *review denied*, 133 Wn.2d 1019 (1997); *cf. Prison Legal News, Inc. v. Dep't of Corr.*, 154 Wn.2d 628, 649, 115 P.3d 316 (2005) (investigations by DOC into medical misconduct by prison medical staff do not fall under the "law enforcement" exemption of the PRA and are subject to disclosure).

¶56 The policy behind the PRA is that "free and open examination of public records is in the public interest." RCW 42.56.550(3). As a result, the PRA preserves the most central tenets of representative government, namely the sovereignty of the people and the accountability to the people of public officials and institutions. *See* RCW 42.56-.040; *King County v. Sheehan*, 114 Wn. App. 325, 335, 57 P.3d 307 (2002) (citing *PAWS*, 125 Wn.2d at 251). The PRA allows individuals to make informed decisions about their government and "maintain control over the instruments that they have created" by casting their votes according Former RCW 42.56.030 (2005). And the PRA's "[d]eclaration of policy" states that "full access to information concerning the conduct of government . . . must be assured as a fundamental and necessary precondition to the sound governance of a free society." RCW 42.17.010(11). But as the attorney general points out, inmates such as Parmelee have relinquished their right to vote by engaging in criminal activity and, as a result, forfeited the right to participate in "maintain[ing] control over [their government]." Former RCW 42.56.030.

■ ¶57 In order to determine whether prison inmates have the right to request records under the PRA, we must look beyond the restricted rights of inmates and explore the plain language of the PRA itself to determine its scope and our legislature's intent. *See Fraternal Order of Eagles, Tenino Aerie No. 564 v. Grand Aerie of Fraternal Order of Eagles*, 148 Wn.2d 224, 239, 59 P.3d 655 (2002) (to determine legislative intent, courts must first look to the language of the statute), *cert. denied*, 538 U.S. 1057 (2003). If the statute is unambiguous, then its meaning must be "derived from the plain language of the statute alone." *Fraternal Order of Eagles*, 148 Wn.2d at 239. A statute is ambiguous if one can reasonably interpret it to have more than one meaning; a statute is not ambiguous simply because " 'different interpretations are conceivable.' " *Fraternal Order of Eagles*, 148 Wn.2d at 239-40 (quoting *State v. Keller*, 143 Wn.2d 267, 276, 19 P.3d 1030 (2001), *cert. denied*, 534 U.S. 1130 (2002)). It is a well-settled rule that " 'so long as the language used is unambiguous a departure from its natural meaning is not justified by any consideration of its consequences, or of public policy.' " *State v. Miller*, 72 Wash. 154, 158, 129 P. 1100 (1913) (quoting 36 CYC. *Statutes* 1114 (1910)).

■■ ¶58 Here, the PRA requires state agencies to make public records available to "any person," upon request, unless the record falls within certain specific exemptions. RCW 42.56.080; *Livingston*, 164 Wn.2d at 50. And the PRA specifically forbids agencies from "distinguish[ing] among persons requesting records." RCW 42.56.080; *see Sheehan*, 114 Wn. App. at 341 (holding that the requester's intended use of information may not be the basis for denying a request for the full names of King County police officers). Under the plain language of the PRA, prison inmates have standing to request records because there is no requirement that the requestor be a citizen or hold civil rights. And the statute specifically forbids intent, regardless of whether it is malicious in design, from being used to determine if records are subject to disclosure. RCW 42.56.080.

¶59 Although it did not expressly hold the prisoners had standing under the PRA, in *Livingston*, our Supreme Court addressed the related issue of whether DOC had complied with an incarcerated felon's public records request when the requested material was copied and mailed from DOC but, when the records arrived at the correctional facility, it was confiscated as contraband under DOC's mail policy. *Livingston*, 164 Wn.2d at 50. Ultimately, our Supreme Court held that DOC had complied with the PRA when it copied and mailed the requested documents to the address provided by the requestor and, as a result, DOC's subsequent decision to bar the requestor from receiving the documents pursuant to its mail policy was independent of DOC's decision to provide the documents under the PRA. *Livingston*, 164 Wn.2d at 51. When discussing application of PRA principles to inmates, our Supreme Court stated that

> [i]n its capacity as an agency subject to the [PRA], [DOC] must respond to all public disclosure requests without regard to the status or motivation of the requestor. The statutory directive to screen incoming and outgoing mail [under the DOC mail policy] does not relieve [DOC] of its *obligation to disclose public records requested by an inmate*.

*Livingston*, 164 Wn.2d at 53 (emphasis added). More specifically, our Supreme Court went on to say that DOC "may not deny a public records request based on the requester's status as an inmate." *Livingston*, 164 Wn.2d at 57. Notwithstanding the attorney general's argument to the contrary, this language in *Livingston* is not merely dicta; requiring DOC to disclose public records to inmates was a ruling central to the *Livingston* court's analysis and required for its holding.

¶60 We note that our legislature has had at least two opportunities to narrow the definition of "any person" prior to this suit. In 2000, the legislature declined to adopt H.B. 2458, 56th Leg., Reg. Sess. (Wash. 2000), which would have carved out an exception to the definition of "any person" by preventing disclosure of public records to prison inmates. In 2005, a bill was introduced to reenact and amend former

RCW 42.17.310 (2005). This amendment would have prohibited a person convicted of a felony or a gross misdemeanor from obtaining public records while he or she is incarcerated or otherwise under the supervision of DOC, unless such a denial would interfere with that individual's right to mount a criminal defense. *See* H.B. 2138, 59th Leg., Reg. Sess. (Wash. 2005). Once again, the legislature declined to adopt the amendment.[18]

---

[18] Again, we note that RCW 42.56.565, enacted during the pendency of this appeal, limits access to certain public records by some but not all persons serving criminal sentences. RCW 42.56.565 provides,

(1) The inspection or copying of any nonexempt public record by persons serving criminal sentences in state, local, or privately operated correctional facilities may be enjoined pursuant to this section.

(a) The injunction may be requested by: (i) An agency or its representative; (ii) a person named in the record or his or her representative; or (iii) a person to whom the requests specifically pertains or his or her representative.

(b) The request must be filed in: (i) The superior court in which the movant resides; or (ii) the superior court in the county in which the record is maintained.

(c) In order to issue an injunction, the court must find that:

(i) The request was made to harass or intimidate the agency or its employees;

(ii) Fulfilling the request would likely threaten the security of correctional facilities;

(iii) Fulfilling the request would likely threaten the safety or security of staff, inmates, family members of staff, family members of other inmates, or any other person; or

(iv) Fulfilling the request may assist criminal activity.

(2) In deciding whether to enjoin a request under subsection (1) of this section, the court may consider all relevant factors including, but not limited to:

(a) Other requests by the requestor;

(b) The type of record or records sought;

(c) Statements offered by the requestor concerning the purpose for the request;

(d) Whether disclosure of the requested records would likely harm any person or vital government interest;

(e) Whether the request seeks a significant and burdensome number of documents;

(f) The impact of disclosure on correctional facility security and order, the safety or security of correctional facility staff, inmates, or others; and

(g) The deterrence of criminal activity.

(3) The motion proceeding described in this section shall be a summary proceeding based on affidavits or declarations, unless the court orders otherwise. Upon a showing by a preponderance of the evidence, the court may enjoin all or any part of a request or requests. Based on the evidence, the court may also enjoin, for a period of time the court deems reasonable, future requests by:

¶61 Accordingly, in light of the plain language of the PRA, our Supreme Court's analysis in *Livingston*, and the fact that the legislature has twice declined to narrow this definition, we are constrained to hold that prison inmates, including those blatantly abusing the PRA, have standing to request records under the PRA.

INJUNCTIVE RELIEF

¶62 But whether an inmate has standing to request records under the PRA is a distinct issue from whether a DOC employee may seek an injunction preventing disclosure of records that pertain to him or her when disclosure creates an immediate and identifiable threat. Although an agency cannot ask or consider the purpose for which a record is requested to determine whether it is subject to disclosure, it does not necessarily follow that a volunteered and stated harmful purpose cannot be considered in determining whether to enjoin disclosure of the information. RCW 42.56.540 states,

> The examination of any specific public record may be enjoined if, upon motion and affidavit by an agency or its representative *or a person who is named in the record or to whom the record specifically pertains*, the superior court for the county in which the movant resides or in which the record is maintained, finds that such examination would [(1)] clearly not be in the public interest and [(2)] would substantially and irreparably damage any person, or [(3)] would substantially and irreparably damage vital governmental functions. An agency has the option of notifying persons named in the record or to whom a record specifically pertains, that release of a record has been requested. However, this option does not exist where the agency is required by law to provide such notice.

(Emphasis added.)

(a) The same requestor; or

(b) An entity owned or controlled in whole or in part by the same requestor.

(4) An agency shall not be liable for penalties under RCW 42.56.550(4) for any period during which an order under this section is in effect, including during an appeal of an order under this section, regardless of the outcome of the appeal.

¶63 An injunction is an extraordinary equitable remedy designed to prevent serious harm; its purpose is not to protect a plaintiff from mere inconveniences or speculative and insubstantial injury. *Tyler Pipe Indus., Inc. v. Dep't of Revenue*, 96 Wn.2d 785, 792-96, 638 P.2d 1213 (1982). Injunctive relief is unavailable if the applicant, here the DOC employee, has a complete, speedy, and adequate remedy at law. *Tyler Pipe*, 96 Wn.2d at 791. But a trial court should issue an injunction to an applicant who can demonstrate necessity and irreparable injury. And, as with temporary injunctions, an individual seeking a permanent injunction must demonstrate that (1) he has a clear legal or equitable right, (2) he has a well-grounded fear of immediate invasion of that right, and (3) that the acts he is complaining of have or will result in actual and substantial injury. *Tyler Pipe*, 96 Wn.2d at 792. Generally, when a trial court considers whether to issue an injunction, it should weigh the following factors:

(a) the character of the interest to be protected, (b) the relative adequacy to the plaintiff of injunction in comparison with other remedies, (c) the delay, if any, in bringing suit, (d) the misconduct of the plaintiff if any, (e) the relative hardship likely to result to the defendant if an injunction is granted and to the plaintiff if it is denied, (f) the interest of third persons and of the public, and (g) the practicability of framing and enforcing the order or judgment.

*Holmes Harbor Water Co. v. Page*, 8 Wn. App. 600, 603, 508 P.2d 628 (1973). Although a trial court should consider the above factors, they are not essential elements of an action for injunctive relief; the essential elements are necessity and irreparable injury. *Hollis v. Garwall, Inc.*, 88 Wn. App. 10, 16, 945 P.2d 717 (1997), *aff'd*, 137 Wn.2d 683, 974 P.2d 836 (1999). Moreover, the trial court must precisely tailor a permanent injunction to prevent a specific harm. *Kitsap County v. Kev, Inc.*, 106 Wn.2d 135, 143, 720 P.2d 818 (1986); *Whatcom County v. Kane*, 31 Wn. App. 250, 253, 640 P.2d 1075 (1981). As a result, the order granting the injunction must describe in reasonable detail the acts

enjoined as well as the reasons supporting issuance of the injunction, above and beyond the complaint or other documents. *See* CR 65(d).

¶64 In *PAWS*, our Supreme Court reiterated that the ability of courts to enjoin the release of specific public records under the PRA's injunctive relief provision, RCW 42.56.540, does not operate as an independent exemption, but rather "merely creates an injunctive remedy" because it is "a *procedural* provision which allows a superior court to enjoin the release of *specific* public records if they fall within *specific* exemptions found elsewhere in the [PRA]." *PAWS*, 125 Wn.2d at 257; *see also* RCW 42.56.540. Stated differently, the PRA's injunction statute governs access to a remedy but does not create a substantive basis for that remedy. *PAWS*, 125 Wn.2d at 258. Moreover, RCW 42.56.540 specifically refers to an injunction sought by an *individual* "who is named in [a] record or to whom [a] record specifically pertains." Thus, if an individual about whom a public record is sought wants to enjoin disclosure under the injunction statute, the first step is to determine whether or not the information involved is in fact within one of the PRA's exemptions. *PAWS*, 125 Wn.2d at 258. But *PAWS* does not set out any subsequent steps that courts should take in order to determine whether an individual about whom a public record pertains may be granted injunctive relief. The holding in *PAWS* was limited to whether RCW 42.56.540 is an independent PRA exemption or merely creates a remedy. This makes sense because if a record is exempt, an adequate remedy exists and injunctive relief is not necessary (and hence not available) because the record is not subject to disclosure.

¶65 Although, in general, an agency cannot consider the requester's intent when determining whether public records are subject to disclosure under the PRA, when the requestor announces an explicit and volunteered threat, to ignore such an intent leads to absurd consequences unintended by the PRA. For example, if, hypothetically, an inmate requested specific information about a government

employee in order to ensure that his hired killer murdered the right person, it is absurd to assert that under the PRA the people of the state of Washington or our legislature intended to compel the agency to disclose this information to the requester. But despite these potentially illogical and catastrophic results, the language in *PAWS* suggests—but does not expressly hold—that an individual referenced in a public record cannot seek an injunction unless the record falls under a specific, enumerated exemption. Such an overbroad reading of *PAWS* would mean that individual employees facing a volunteered and explicit threat are left without recourse. And if DOC, or any other state agency, cannot provide a reasonably safe working environment for its own employees, these individuals must have the right to protect themselves by personally seeking an injunction to prevent an inmate's threatening them with bodily harm, defamatory conduct, or other harmful behavior from receiving the information that inmate seeks to use to carry out that harm. To hold otherwise would eviscerate the fundamental and equitable purpose of an injunction. *See Agronic Corp. of Am. v. deBough*, 21 Wn. App. 459, 464, 585 P.2d 821 (1978) (the purpose of an injunction is not to punish a wrongdoer for past actions but to protect a party from present or future wrongful acts (citing *Lewis Pac. Dairymen's Ass'n v. Turner*, 50 Wn.2d 762, 314 P.2d 625 (1957))).

¶66 Thus, under the law applicable at the time of Parmelee's request, DOC cannot consider an individual's status as an inmate when determining whether information is subject to disclosure under the PRA, but the trial court could consider a PRA requestor's explicit and volunteered threat when deciding whether an injunction is required to protect the rights of the government's employees. The issue is not whether DOC has an obligation under the PRA to provide records but, rather, whether an individual government employee has a right to petition a court for protection from otherwise harmful behavior.

¶67 Under the facts of this case, it was reasonable for the superior court to conclude that, given Parmelee's

intended use of photographs he requested, an injunction was appropriate to protect the rights of the individual government employee. Such disclosure is not in the public interest and would damage the employees by subjecting them to intolerable invasions of the privacy of their homes and family[19] and damage vital government functions. We note that the record amply supports the DOC's claim that Parmelee's request is a perverse abuse of the PRA. The PRA declares that the act "shall be enforced so as to insure that the information disclosed will not be misused for arbitrary and capricious purposes and to insure that all persons reporting under this chapter will be protected from harassment and unfounded allegations based on information they have freely disclosed." RCW 42.17.010(11). Here, Parmelee's unfounded allegations that DOC employees are sexual predators and his intent to distribute forged sexually violent predator (SVP) fliers are a misuse of public records to harass DOC employees that should not occur without providing the opportunity for the employee to seek protection from the courts. Although government agencies may not rely on it, given the purpose of an injunction and the policy behind the PRA, the superior court did not err in issuing the injunction to protect the rights of those employees who have been the subject of volunteered and explicit threats, including those employees named in Parmelee's sexual predator flyer.[20]

EMPLOYEE BADGE IDENTIFICATION PHOTOGRAPHS

A. PUBLIC RECORD

¶68 The PRA requires agencies to make "public records" available for inspection and copying, absent an exemption

---

[19] Wash. Const. art. I, § 7 states, "No person shall be disturbed in his private affairs, or his home invaded, without authority of law."

[20] We note that SVP fliers of the sort Parmelee intends would also interfere with the vital governmental function of accurately alerting its citizens to the presence of convicted sex offenders in their neighborhood by flooding the public with false notices. These notices not only harass DOC employees and their families, but also inure the public to the safety information communicated in the genuine fliers by flooding the market with counterfeit SVP notices.

from disclosure. RCW 42.56.070(1). As a result, the determination of whether a document is a "public record" is critical for purposes of the PRA. *Oliver v. Harborview Med. Ctr.*, 94 Wn.2d 559, 565 n.1, 618 P.2d 76 (1980). The PRA defines "public record" as "[(1)] any writing [(2)] containing information relating to the *conduct* of government or the *performance* of any governmental or proprietary function [(3)] prepared, owned, used, or retained by any state or local agency regardless of physical form or characteristics." Former RCW 42.17.020(41) (2005) (emphasis added); *Oliver*, 94 Wn.2d at 565 n.1. The PRA further defines "writing" as

> handwriting, typewriting, printing, photostating, photographing, and every other means of recording any form of communication or representation, including, but not limited to, letters, words, pictures, sounds, or symbols, or combination thereof, and all papers, maps, magnetic or paper tapes, photographic films and prints, motion picture, film and video recordings, magnetic or punched cards, discs, drums, diskettes, sound recordings, and other documents including existing data compilations from which information may be obtained or translated.

Former RCW 42.17.020(48) (2005).

¶69 Here, the broad definition of "writing" expressly includes photographs and DOC prepares employee badge identification photographs; thus, these photographs satisfy the first and third elements of the definition of "public record." *See* former RCW 42.17.020(41). The remaining question is whether a DOC employee badge identification photograph relates to the conduct of "any governmental or proprietary function." Former RCW 42.17.020(41). Although the PRA is intended to enable the citizens of the state of Washington to retain sovereignty over our government and to demand full access to information relating to our government's activities, the PRA was "not intended to make it easier for the public to obtain personal information about individuals who have become subject to government action due to personal factors . . . . Such personal information generally has no bearing on how our government

operates." *Lindeman v. Kelso Sch. Dist. No. 458*, 127 Wn. App. 526, 535-36, 111 P.3d 1235 (2005), *rev'd on other grounds*, 162 Wn.2d 196, 172 P.3d 329 (2007).

¶70 While several Washington cases have examined whether particular "writings" that are "prepared, owned, used, or retained" by government "relating to the conduct of government or the performance of any governmental or proprietary function," none articulates a comprehensive test or presents an analytical framework for making such a determination. Former RCW 42.17.020(41).

¶71 Here, we do not answer the question of whether the requested photographs are public records. As an initial matter, the record is insufficient for us to determine if these particular photographs are public records. Although there is some suggestion that all DOC badges look the same, except that they are issued in differing colors based on whether the photograph is of an individual who is a correctional officer, a staff member, or an inmate, DOC has not addressed the devious potential security risk that releasing these badges may pose in this digital age. Moreover, we cannot determine from this record how the photographs are stored, whether the badge itself contains the only copy of the photograph, whether the photographs are stored digitally elsewhere, whether a hard copy of the photographs exits, or whether the format of such photographs enables them to be digitally scanned and altered. Despite our request, DOC's briefing does not squarely address the issue and asks us to assume, without holding, that these photographs are public records. Because the record is insufficient for us to do otherwise, we must presume that the photographs DOC prepared to give Parmelee in response to his PRA request are public records relating to the conduct of government or proprietary function.

B. PRIVATE INFORMATION EXEMPTION

¶72 Parmelee argues that the trial court erred when it considered his possible intended use of the photographs and found that DOC employee photographs were exempt

from disclosure under the privacy exemption.[21] As set out above, although the superior court did not err in considering Parmelee's stated intent in deciding whether to exercise its equitable injunctive authority regarding individual employee's requests for protection, the version of the PRA in effect at the time Parmelee made the requests at issue in this case prohibits consideration of such reasons in analyzing whether records are statutorily exempt from disclosure.

¶73 The PRA contains specific exemptions from disclosure for certain categories of public records. RCW 42.56.210. Specifically, RCW 42.56.230(2) provides that "personal information in files maintained for employees . . . of any public agency to the extent that disclosure would violate their right to privacy" is exempt from public inspection and copying. Under the PRA, a person's right to privacy under RCW 42.56.050 is violated "only if disclosure of information about the person: (1) Would be highly offensive to a reasonable person, and (2) is not of legitimate concern to the public." RCW 42.56.050. The term "personal information" means information "of or relating to a particular person." *Lindeman*, 127 Wn. App. at 539-40 (quoting Webster's New International Dictionary 1686 (3d ed. 1969)) (declining to conclude that personal information implies private information because it would render other language in the PRA superfluous). Generally, the right of privacy pertains only to the intimate details of one's personal and private life.[22] *Spokane Police Guild*, 112 Wn.2d at 38.

¶74 The first element of the privacy analysis is whether disclosure of the employee badge photographs

---

[21] In the *DOC v. Parmelee* matter, both DOC and Parmelee devote portions of their briefs to the issue of whether the flyers at issue qualify as slander. But this is not a tort action for slander or libel and we decline to address the issue further.

[22] It is important to note that Wash. Const. art. I, § 7 guarantees the people of Washington the right to privacy above and beyond the privacy exemption provided under the PRA. And an individual does not wholly surrender his or her constitutional right to privacy by virtue of his or her decision to seek employment with a governmental agency such as DOC. We can think of no reason why an individual who serves as a cook at DOC is afforded a lesser privacy right to the use of their photographic image than an individual who chooses to work as a cook at a local diner.

would be highly offensive to a reasonable person. RCW 42.56.050. An individual has a privacy interest whenever information that reveals unique facts about those named is linked to an identifiable individual. *Tiberino v. Spokane County*, 103 Wn. App. 680, 689, 13 P.3d 1104 (2000).

 ¶75 But a passport-type identification photograph is not the type of sensitive, personal information that the PRA intended to exclude from disclosure. *See Hearst Corp. v. Hoppe*, 90 Wn.2d 123, 136, 580 P.2d 246 (1978) (identifying examples of private information, including sexual relations; family quarrels; unpleasant or disgraceful or humiliating illnesses; or intimate, personal letters). As Parmelee points out, the information revealed by a public employee's photograph on his or her government identification badge is decidedly public: it is information that the employee reveals to colleagues, friends, and strangers on a daily basis.[23] *See Sheehan*, 114 Wn. App. at 342 (holding that a public disclosure request for all officers in King County did not violate officers' right to privacy because the information was already public). Moreover, it is an image that could be captured (but not necessarily disseminated) legally by any member of the public or the media while the employee is walking down the street. *Sheehan*, 114 Wn. App. at 342.

¶76 Perhaps more important, the PRA contains specific provisions listing what type of employment information is exempt from public disclosure, including employment applications, resumes, employees' residential addresses and telephone numbers, e-mail addresses, Social Security numbers, and emergency contact information. *See* former RCW

---

[23] Parmelee also relies on *Sheehan* by analogizing the employee photographs here with officers' names in *Sheehan*. Parmelee quotes *Sheehan*'s reasoning that

[o]fficers who are not operating undercover disclose their own names each day, on the name tags that they wear on their uniforms, on the tickets and citations that they issue, to suspects whom they interrogate, to witnesses whom they interview, and on the public record when they testify in open court.

*Sheehan*, 114 Wn. App. at 340. We note that the *Sheehan* court was not analyzing whether the names were exempt as an invasion of the officers' privacy but rather whether the names qualified as " 'specific intelligence information' " that was " 'essential to effective law enforcement.' " *Sheehan*, 114 Wn. App. at 338-39.

42.56.250 (2006). The legislature did not include identification badge photographs in this list. *See Wash. State Republican Party v. Pub. Disclosure Comm'n*, 141 Wn.2d 245, 280, 4 P.3d 808 (2000) (refusing to read an implied exemption into the PRA because "[w]here a statute specifically lists the things upon which it operates, there is a presumption that the legislating body intended all omissions"). Generally, disclosure of a passport-type identification photograph is not highly offensive to a reasonable person and, as a result, we do not reach the second element of the privacy analysis: whether disclosure of the DOC employees' photographs is a legitimate public concern. RCW 42.56.050.

C. MATTERS UNDER THE PROVINCE OF DOC

¶77 Next, DOC suggests that if we find that the employee photographs are not exempt under the privacy exemption, we should allow it to refuse Parmelee's public disclosure request under the particular facts of this case. Specifically, DOC argues that this is a matter affecting a prison's internal security and, thus, is within the province of prison administrators, not this court. Because accepting this premise would eviscerate the PRA, we are compelled to disagree.

¶78 DOC relies on a Wisconsin Court of Appeals case, *State ex rel. Morke v. Record Custodian, Department of Health & Social Services*, 159 Wis. 2d 722, 465 N.W.2d 235 (Ct. App. 1990), to support its argument that concern for the safety and well-being of the prison staff and their families outweighs the general rule favoring public access to government records. In *Morke*, the Wisconsin court upheld a prison records custodian's decision to refuse an inmate's request for the names, home addresses, and published home telephone numbers of all persons employed at his assigned prison. 159 Wis. 2d at 724. The court reasoned that if the records custodian gave the inmate the information he requested, it would jeopardize the institution's interest in ensuring its employees' safety. *Morke*, 159 Wis. 2d at 726. But *Morke*, like decisions from other jurisdictions, is gener-

ally not helpful because it interpreted a different statute. *Sappenfield*, 127 Wn. App. at 89. Moreover, *Morke* is distinguishable from the case at hand. Unlike the Wisconsin statute, the PRA's privacy exemption specifically exempts home addresses and telephone numbers from disclosure. *See* RCW 42.56.050.

¶79 Federal and state courts have consistently deferred to prison officials regarding matters affecting prison management and prison administrators for the difficult judgments concerning institutional operations. *Turner v. Safley*, 482 U.S. 78, 89, 107 S. Ct. 2254, 96 L. Ed. 2d 64 (1987). Despite the deference given prison officials, the intersection of prison management and the PRA presents unique challenges. *See, e.g., Sappenfield*, 127 Wn. App. at 90 (because they are incarcerated, prisoner access to records may occur "by means of copies mailed upon payment of a reasonable fee" instead of an in-person examination). And, while under *Livingston*'s reasoning DOC would be permitted to intercept these photographs in their mailroom, DOC argues that we should not require it to rely on mailroom employees intercepting such materials when an inmate makes his malicious intentions known. But the PRA does not allow DOC to decide unilaterally what public records it can refuse to disclose based on the requestor's intended purpose. *See* RCW 42.56.080. As stated above, it is the affected employee, not DOC, who retains the equitable statutory right to protect himself from a stated nefarious intent under the PRA.

*MATHIEU V. PARMELEE*

A. NONPHOTOGRAPHIC RECORDS

1. PERFORMANCE REVIEWS

¶80 Parmelee argues that the superior court erred when it categorically enjoined disclosure of Mathieu's

performance reviews[24] because it failed to identify a specific exemption for those records. Because the trial court failed to review the records and fully analyze the issue, we agree. Evaluations of public employees that contain specific instances of misconduct are subject to public disclosure. *Spokane Research & Def. Fund v. City of Spokane*, 99 Wn. App. 452, 456, 994 P.2d 267 (2000). But evaluations that do not contain specific instances of misconduct are exempt because both the supervisor and the employee reasonably expect those evaluations to remain confidential and the disclosure of that information would be offensive to a reasonable person and be of small public concern. *Spokane Research*, 99 Wn. App. at 456-57.

▪▪▪ ¶81 Here, Mathieu's personnel records are not subject to disclosure under the PRA unless they contain specific instances of misconduct while in the performance of her public duties for which there is a legitimate public concern. *Limstrom v. Ladenburg*, 85 Wn. App. 524, 533-34, 933 P.2d 1055 (1997) (" '[T]he disclosure of the details of [an employee's] misconduct, while in the performance of his public duties, is not highly offensive' " and "there is no doubt that the misconduct of a prosecutor in the performance of her duties is a matter of legitimate public concern." (quoting *Dawson v. Daly*, 120 Wn.2d 782, 796, 845 P.2d 995 (1993))), *rev'd on other grounds*, 136 Wn.2d 595, 963 P.2d 869 (1998). The record on appeal to this court does not contain the records DOC compiled for Parmelee regarding Mathieu. Accordingly, although our review is de novo, we cannot determine whether the records are properly subject to disclosure and remand is necessary to allow the trial court to review the records in camera and determine which, if any, Parmelee is entitled to. *See Zink v. City of Mesa*, 140

---

[24] Parmelee also requested Mathieu's "critical" employment records. It is unclear what Parmelee is referring to when he requested Mathieu's "critical" employment records and, as a result, this request is not sufficiently specific to require production. It is not a request for a specific document or specific group of documents, but rather a record that the record keeper deems "critical" in his or her own judgment or believes that the requestor might think "critical." Generally, DOC does not have a duty to clarify Parmelee's request.

Wn. App. 328, 336-43, 166 P.3d 738 (2007) (holding that remand is necessary for determination by the superior court whether there had been compliance with the PRA).

### 2. COMPENSATION RECORDS

¶82 Next, Parmelee argues that the superior court erred when it enjoined disclosure of Mathieu's compensation records, except for information related to her pay grade and pay scale. We agree. Information about a public employee's compensation, including publicly funded fringe benefits, vacation, and sick leave pay, is subject to disclosure. *See Tacoma Pub. Library v. Woessner*, 90 Wn. App. 205, 222, 951 P.2d 357, 972 P.2d 932 (1998).[25]

### 3. ADMINISTRATIVE GRIEVANCES AND INTERNAL INVESTIGATION RECORDS

¶83 Parmelee also argues that the superior court erred when it found that Mathieu's administrative grievances and investigative records were exempt from disclosure.

¶84 Under former RCW 42.56.240(1), "[s]pecific intelligence information and specific investigative records compiled by investigative, law enforcement, and penology agencies, and state agencies vested with the responsibility to discipline members of any profession, the nondisclosure of which is essential to effective law enforcement or for the protection of any person's right to privacy" is exempt from disclosure under the PRA. As stated above, this exemption does not permit DOC to withhold records pertaining to staff discipline. *See Limstrom*, 85 Wn. App. at 533. For purposes of intelligence and investigation records, "law enforcement" means an agency's investigation of illegal conduct, subject to a fine or prison term. *Brouillet v. Cowles Publ'g Co.*, 114 Wn.2d 788, 796, 791 P.2d 526 (1990). But because the record on review does not contain the records DOC compiled for Parmelee, we cannot determine if they are properly subject

---

[25] We note that *Woesner* did not address the applicability of the Health Insurance Portability and Accountability Act of 1996, 42 U.S.C. §§ 1320d to 1320d-8, to PRA requests for public employees' compensation records.

to disclosure under the PRA and remand to the trial court for such review as is necessary. *See Zink*, 140 Wn. App. at 336-43.

### 4. STAFF TRAINING RECORDS

▉ ¶85 Parmelee further argues that the superior court erred when it limited DOC's release of Mathieu's training record to the 24 months preceding Parmelee's request. Generally, training records are subject to disclosure under the PRA unless they fall under a specific exemption, such as the law enforcement exemption. *See Livingston v. Cedeno*, 135 Wn. App. 976, 978, 146 P.3d 1220 (2006) (where DOC complied with an inmate's PRA request for training records of a specific corrections officer), *aff'd*, 164 Wn.2d 46, 186 P.3d 1055 (2008). Here, Mathieu's training records are subject to disclosure, unless they fall under an exemption. DOC compiled these documents and was apparently willing to produce them. *See Spokane Police Guild*, 112 Wn.2d at 37. But because the record on review does not contain the records DOC compiled for Parmelee, we cannot determine if they are properly subject to disclosure under the PRA and remand is necessary. *See Zink*, 140 Wn. App. at 336-43.

### B. DUE PROCESS

¶86 Parmelee argues that the PRA establishes a state created "liberty interest" and the trial court denied him his right to due process because it "did not consider [his] evidence and denied [him] an opportunity to present evidence or argument on critical issues." Br. of Appellant (*Mathieu v. Parmelee*) at 10. We disagree.

▉ ▉ ¶87 The Washington and Federal constitutions prohibit the government from depriving a person of life, liberty, or property without due process of law. WASH. CONST. art. I, § 3; U.S. CONST. amend. XIV, § 1. Washington courts have not held that the PRA creates a constitutional right subject to due process protections under either the state or federal constitutions. While statutes or regulations can create due process liberty interests where none otherwise

existed, the statute must still implicate a liberty interest. *See In re Pers. Restraint of Cashaw*, 123 Wn.2d 138, 145, 866 P.2d 8 (1994) (citing *Olim v. Wakinekona*, 461 U.S. 238, 250, 103 S. Ct. 1741, 75 L. Ed. 2d 813 (1983)). If a statute merely creates procedure, it does not create a liberty interest. *In re Cashaw*, 123 Wn.2d at 146.

 ¶88 Here, the PRA does not create a substantive liberty right. But even if we assume, without holding, that the PRA creates a property interest, Parmelee was not denied due process. Parmelee's argument that the superior court denied him due process by granting the injunction without his meaningful participation lacks merit. In *Mathieu v. Parmelee*, the trial court allowed Parmelee to participate by considering his motions,[26] as well as the evidence attached to his pleadings, and allowing him to argue his motions and respond over the telephone. Moreover, Parmelee engaged in extensive discovery. Thus, although the trial court's decision may have been adverse to him, Parmelee received due process and these procedures provided him an adequate opportunity to be heard.

*DeLong V. DOC*

A. Request To Intervene under CR 24

¶89 Parmelee also contends that the superior court erred when it denied his requests to intervene under CR 24. Parmelee's request to intervene was untimely and was properly denied.

 ¶90 We review rulings on intervention as a matter of right de novo. *Westerman v. Cary*, 125 Wn.2d 277, 302, 892 P.2d 1067 (1994). In order to intervene as a matter of right under CR 24(a), the intervenor must satisfy four criteria: (1) the application to intervene must be timely, (2) the applicant claims an interest that is the subject of the action, (3) the disposition will likely adversely affect the

---

[26] In fact, the trial court granted Parmelee's motion to dismiss all of the petitioners except Mathieu because she was the only petitioner who signed the original petition.

applicant's ability to protect that interest, and (4) the applicant's interest is not adequately protected by the existing parties. CR 24(a); *Ferenĉak v. Dep't of Labor & Indus.*, 142 Wn. App. 713, 720, 175 P.3d 1109 (2008) (citing *Spokane County v. State*, 136 Wn.2d 644, 649, 966 P.2d 305 (1998)), *aff'd sub nom. Kustura v. Dep't of Labor & Indus.*, 169 Wn.2d 81, 233 P.3d 853 (2010).

¶91 We review a trial court's evaluation of timeliness for abuse of discretion. *Olver v. Fowler*, 161 Wn.2d 655, 663, 168 P.3d 348 (2007) (citing *Kreidler v. Eikenberry*, 111 Wn.2d 828, 832, 766 P.2d 438 (1989)). A trial court abuses its discretion when its decision is manifestly unreasonable, or exercised on untenable grounds, or for untenable reasons. *Olver*, 161 Wn.2d at 663 (quoting *T.S. v. Boy Scouts of Am.*, 157 Wn.2d 416, 423, 138 P.3d 1053 (2006)). A trial court's decision is manifestly unreasonable if it adopts a view that no reasonable person would take. *Olver*, 161 Wn.2d at 663 (quoting *T.S.*, 157 Wn.2d at 424). Postjudgment intervention requires a strong showing that intervention is necessary, taking into consideration all of the circumstances including prior notice, prejudice to the other parties, and reasons for the delay. *Olver*, 161 Wn.2d at 663 (citing *Kreidler*, 111 Wn.2d at 833).

¶92 On October 10, 2006, Parmelee filed a notice of appearance and sought to intervene in the action "On Behalf Of His Unprotected Interests And [To] Replace The DOC As Defendant" CP (DeLong) at 119. Parmelee again moved to intervene on October 23, 2006 and October 24, 2006, after entry of the trial court's orders.

¶93 Although Parmelee first moved to intervene on October 10, 2006, for reasons that are unclear in this record, the superior court never ruled on or acknowledged this motion. But even if the motion had been properly docketed, Parmelee did not serve DOC and DOC did not have proper notice of Parmelee's motion to intervene. CR 5. Moreover, Parmelee failed to offer any explanation for his failure to properly serve his initial motion and, thus, Parmelee failed to make a "strong showing" that his inter-

vention was necessary in light of his failure to serve DOC. Accordingly, we do not consider Parmelee's untimely intervention argument further.

## B. JOINDER UNDER CR 19(a)

¶94 Although Parmelee's motion to intervene was untimely, the issue of whether Parmelee should have been joined as a necessary party in the case is one that can be raised for the first time on appeal; a trial court lacks jurisdiction if all necessary parties are not joined. *Treyz v. Pierce County*, 118 Wn. App. 458, 462, 76 P.3d 292 (2003), *review denied*, 151 Wn.2d 1022 (2004).

¶95 Under CR 19(a), a person shall be joined as a necessary party if (1) the trial court cannot make a complete determination of the controversy without that party's presence, (2) the party's ability to protect its interest in the subject matter of the litigation would be impeded by a judgment in the case, and (3) judgment in the case necessarily would affect the party's interest. *Town of Ruston v. City of Tacoma*, 90 Wn. App. 75, 82, 951 P.2d 805, *review denied*, 136 Wn.2d 1003 (1998).

¶96 Here, Parmelee's participation was necessary to protect his interests under the PRA. This is particularly true here, where the petitioners (DOC employees) and DOC had identical interests and the proceedings were not genuinely adversarial. The superior court heard extensive argument from two petitioners detailing Parmelee's harassment of DOC personnel and it based much of its decision on Parmelee's history of disruptive and malicious behavior. Because of their aligned interests, DOC had no incentive to cross-examine the DOC employees' testimony regarding Parmelee's harassment. Moreover, the petitioners' and DOC's interests in the result were entirely aligned in this matter: each sought to preclude Parmelee from obtaining records under the PRA and argued that he should be excluded from participation in the matter. As a result of this alliance, neither party presented Parmelee's arguments and the court did not otherwise address inmate concerns.

Clearly, Parmelee's interests were necessarily impacted by the adverse judgment. Because Parmelee had an interest relating to the subject matter of the action, his interests could be (and were) impacted by an adverse judgment and the trial court could not make a complete determination without Parmelee's participation, he was a necessary party and the superior court erred by excluding him from participating in the proceeding. *Burt*, 168 Wn.2d at 836.

¶97 As we held in *Mathieu v. Parmelee* above, the trial court's consideration of written motions, documents, and telephonic submissions satisfies due process and is sufficient to provide Parmelee an adequate opportunity to be heard. The PRA does not require oral argument or a full evidentiary hearing. RCW 42.56.540; Thurston County Superior Court Local Civil Rule 43(e) (unless otherwise ordered, motions shall be decided only on the pleadings, affidavits, declarations, published depositions, and other documents duly filed and served); *see, e.g.*, RCW 42.56-.565(3) (effective March 20, 2009) ("The motion proceeding described in this section shall be a summary proceeding based on affidavits or declarations, unless the [superior court] orders otherwise.").

### C. JUDICIAL NOTICE

¶98 Parmelee argues that the trial court erred when it took judicial notice of the evidence in *Mathieu v. Parmelee* in the *DeLong v. DOC* matter. Specifically, Parmelee argues that, although there was some overlap between the issues in the two cases, they were separate actions with separate parties and, thus, it was improper for the superior court to take judicial notice. We disagree.

¶99 Although a court "cannot, while trying one cause, take judicial notice of records of other independent and separate judicial proceedings even though they [are] between the same parties," a trial court may take judicial notice of the record in proceedings "engrafted, ancillary, or supplementary" to the cause before it. *Swak v. Dep't of Labor & Indus.*, 40 Wn.2d 51, 54, 240 P.2d 560 (1952). Here,

the petitioners in the *DeLong v. DOC* case were many of the same individuals originally named in the *Mathieu v. Parmelee* case who were dismissed on the technical ground of having failed to sign the petition. The issues in each case, and the evidence upon which each relied, were identical. Thus, the *Mathieu v. Parmelee* action is "engrafted, ancillary, or supplementary" to the *DeLong v. DOC* action and the trial court's decision to take judicial notice of the evidence in *Mathieu v. Parmelee* was proper. *See Swak*, 40 Wn.2d at 54.

¶100 In conclusion, we hold that despite obvious and repeated abuses, prison inmates had and continue to have standing to request records under the PRA. Although at the time Parmelee filed the requests at issue in this case the trial court could not consider Parmelee's intent when determining whether a document is subject to disclosure under the PRA, we hold that it did not err when it considered Parmelee's explicit and volunteered threat in deciding whether to grant the government employee's request for an injunction to protect the individual rights of that government employee.

¶101 Accordingly, as to *Mathieu v. Parmelee*, we are constrained to reverse the injunction against Parmelee because Mathieu was not named in his counterfeit sexual predator flyer and is unable to demonstrate that she was the victim of this explicit and volunteered threat. Moreover, we hold that the trial court erred when it found that Mathieu's personnel records, intelligence and investigation reports, and portions of her compensation records and training records were exempt from disclosure under the PRA. But because the record on appeal to this court does not contain the records DOC compiled for Parmelee regarding Mathieu, remand is necessary to allow the trial court to review in camera the documents regarding Mathieu's personnel records, intelligence and investigation reports, and training records and determine whether Parmelee is entitled to them.

¶102 As to *DeLong v. DOC*, we hold that while Parmelee's request to intervene was properly denied as untimely, the trial court erred when it refused to join Parmelee as a necessary party. We must vacate for want of jurisdiction and remand to the trial court for further proceedings consistent with this opinion.

¶103 As to *DOC v. Parmelee*, we hold that while ordinarily a superior court cannot consider a PRA requestor's intent when determining whether an injunction is appropriate, DOC employees have the right to seek an injunction to protect their individual privacy rights when faced with an explicit and volunteered threat.

BRIDGEWATER, J., concurs.

¶104 HOUGHTON, J.[*] (concurring and dissenting) — I concur with the majority except to the extent that it bases its joinder discussion on *Burt v. Department of Corrections*, 168 Wn.2d 828, 231 P.3d 191 (2010). I served as a justice pro tempore on *Burt* and joined in the dissent. Therefore, I dissent from relying on its reasoning here.

Review granted at 171 Wn.2d 1004 (2011).

---

[*] Judge Houghton is serving as judge pro tempore of the Court of Appeals, Division Two, under RCW 2.06.150.